UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LUANN GILLESPIE,        )<br>   Plaintiff,        )<br>        )<br>-v-        )<br>        )<br>LIBERTY LIFE ASSURANCE COMPANY        )<br>OF BOSTON and        )<br>NATIONAL CITY CORPORATION        )<br>LONG TERM DISABILITY PLAN,        )<br>   Defendants.        )<br>_____)| No. 1:10-cv-00388<br><br>HONORABLE PAUL L. MALONEY |

**OPINION REGARDING BENEFITS CALCULATION**

This case involves Plaintiff Luann Gillespie's claim for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* On October 12, 2012, this court granted Plaintiff's motion for entry of judgment. (ECF No. 46.) Before the court today are both parties' briefs regarding the amount of benefits to be reinstated to Plaintiff and any calculation of prejudgment interest. (ECF Nos. 47–48.)

**I. BACKGROUND**

As discussed in this court's prior opinion and order (ECF No. 46), National City Corporation's Welfare Benefits Plan ("the Plan") applied a two-part standard to determine whether a claimant was entitled to long-term disability benefits. For the first two years of disability, a claimant is entitled to benefits if she is "[un]able to perform all of the material duties" of the job she had previously had. (AR0970.) After two years, however, the standard changes, and the claimant must be "Totally Disabled"—that is, "unable to perform, with reasonable continuity, all of the duties of *any occupation* for which [she] is or could become qualified." (*Id.*; AR0967 (emphasis added).)

Ms. Gillespie was denied benefits at this second stage. Initially, she had been awarded long-

term disability benefits under the previous-occupation standard, but in its continuing-eligibility determination after two years, Defendant Liberty concluded that Ms. Gillespie was not "Totally Disabled" as defined by the Plan. Liberty informed Ms. Gillespie by letter that "we have determined that you are no longer eligible for benefits under the LTD Plan and no further benefits will be payable beyond July 17, 2009." (AR0071.)

Ms. Gillespie appealed this decision, but Liberty upheld its original finding on March 17, 2010. (AR0056.)

## II. DISCUSSION

The parties agree that during the time period at issue, Ms. Gillespie would have received net benefits of $452.96 per month under the Plan (a monthly benefit of $1,388.96, offset by her Social Security Disability Insurance benefits of $936 per month). The parties further agree to calculate prejudgment interest using a rate of 0.25% per month and no compounding. The parties disagree, however, about the length of time that Ms. Gillespie is owed benefits.

Defendants argue that Ms. Gillespie is owed benefits from July 17, 2009 until March 17, 2010—from when Liberty determined that Ms. Gillespie was "no longer eligible for benefits" to when it upheld its decision on appeal. This court found only that this decision was improper, Defendants argue; it did not and cannot find that Ms. Gillespie is affirmatively entitled to benefits for the intervening time period. Indeed, under the Plan, Ms. Gillespie bears the burden of proving that she is eligible for benefits, and it is undisputed that she has not presented evidence that her disability has existed since March 17, 2010. For these reasons, Defendants conclude that this court lacks authority to award Ms. Gillespie any more than those nine months of benefits.

As Defendants correctly note, the goal of an ERISA remedy is to "plac[e] the plaintiff in the

position he or she would have occupied but for the defendant's wrongdoing." *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 618 (6th Cir. 1998). Defendants fail to convince the court that the status quo in this case would leave Ms. Gillespie without long-term disability benefits, however.

In determining an ERISA plaintiff's "but-for" position, the Sixth Circuit has distinguished between benefits granted then withdrawn and benefits never granted in the first place. In *Wenner v. Sun Life Assurance Co. of Canada*, 482 F.3d 878 (6th Cir. 2007), that court held that where a defendant improperly terminated benefits that had already been granted, the proper remedy was to reinstate the benefits retroactively:

> A plaintiff denied any benefits at all has no expectation of receiving them unless her claim is meritorious, and thus returning her to the status quo prior to the § 1133 violation requires only curing the procedural violation so that she may fairly pursue the merits of her claim. On the other hand, a plaintiff whose benefits have been terminated has, prior to the termination, a full expectation of continued disability payments until they are terminated by lawful procedures. Thus, "prior to the termination of her benefits by improper procedures, the status quo was that [the plaintiff] was receiving long-term disability benefits" and "the appropriate remedy is an order vacating the termination of her benefits and directing [the defendant] to reinstate retroactively the benefits."

*Id.* at 883–84 (alteration in original) (quoting *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629–30 (7th Cir. 2005)). That is just the case here. Before July 17, 2009, Ms. Gillespie was receiving long-term disability benefits. Liberty attempted to take away those benefits, but as this court has found, that was error. If not for Liberty's wrongdoing, Ms. Gillespie's benefits would have continued. Indeed, Liberty admits as much in its letter to Ms. Gillespie informing her that "we have determined that you are *no longer* eligible for benefits under the LTD Plan and no *further* benefits will be payable beyond July 17, 2009." (AR0071 (emphasis added).) The status quo to which Ms. Gillespie should be returned, therefore, is one where she continues to receive

benefits.

The terms of the Plan provide a twist to this analysis. As noted above, after two years of benefits, the Plan's definition of long-term disability changes from an inability to perform the claimant's prior job to the inability to perform any job. It is at this two-year mark that Liberty denied Ms. Gillespie's benefits, and so Defendant can reasonably argue that Ms. Gillespie never proved her disability under the stricter, "any job" standard. Defendants find support in a Second Circuit decision, *Peterson v. Continental Casualty Co.*, 282 F.3d 112 (2d Cir. 2002), which involved a similar prior-job–any-job distinction. *Id.* at 117–18. The *Peterson* court held that where a plan administrator had never found the plaintiff unable to perform any job, and thus eligible for permanent benefits, the court could not award those benefits in the first instance. *Id.*

*Peterson* involved a distinguishable fact pattern, though. The plan at issue there did not have a two-part definition for long-term disability, as the Plan here does. Instead, the *Peterson* plan awarded short-term benefits on a finding that the claimant could not perform her prior occupation, and long-term benefits on a finding that the claimant could not perform *any* occupation. *Id.* at 117. These two determinations were separate, and a claimant had to satisfy each standard in order to receive benefits. *See id.* The plan administrator had denied Peterson short-term benefits, but made no finding regarding long-term benefits. *Id.* For this reason, the Second Circuit held, the district court had no ground on which to review Peterson's eligibility for long-term benefits. *Id.* at 118.

In this case, however, the Plan's terms work differently. By definition, long-term disability benefits are paid to a "Disabled Participant"—that is, "a Participant who has been determined, pursuant to Section 6, to be eligible for Benefits under this Plan." (AR0965.) When Ms. Gillespie was initially found eligible for long-term disability, she therefore became a "Disabled Participant."

4

She did not automatically lose this status after two years, even though the standard for what constitutes long-term disability changed. The Plan does not require the administrator to review each claim at the two-year mark, denying benefits until the claimant demonstrates "Total Disability." Instead, Section 6.1 only requires the claimant to verify her claims "at the time the Participant makes a claim for Benefits and from time to time thereafter *at the Named Fiduciary's request*." (AR0970 (emphasis added).) Section 6.4 provides that long-term disability benefits "will be paid to a Disabled Participant until" the occurrence of a specified event, such as "the Participant is no longer suffering from a Disability," or "the Participant refuses to be examined" by Plan doctors. (AR0970.) If Liberty had simply done nothing rather than terminating Ms. Gillespie's benefits on July 17, 2009, Ms. Gillespie would have had no affirmative duty to prove "Total Disability" and her benefits would have continued unchanged. Liberty has not requested further medical evidence, and so Ms. Gillespie cannot be faulted for providing none. Thus, once this court invalidates Liberty's decision, Ms. Gillespie will be left at her status quo: receiving benefits.[1]

This is not to say that Defendants are necessarily bound to continue paying Ms. Gillespie benefits in perpetuity. The court's decisions here say nothing about Ms. Gillespie's eligibility for long-term disability benefits after this date, and Defendants are not prohibited from initiating another review of her status. *See Halpin v. W.W. Granger, Inc.*, 962 F.2d 685, 697 (7th Cir. 1992)

---

[1] The Seventh Circuit decision that Defendants cite, *Halpin v. W.W. Granger, Inc.*, 962 F.2d 685 (7th Cir. 1992), actually supports this conclusion. In *Halpin*, the district court found that a plan administrator had erroneously terminated benefits. The court vacated that decision and ordered the defendant to "reinstate the benefits as of . . . the date the benefits were terminated." *Id.* at 697. On appeal, the Seventh Circuit affirmed. The court noted that the district court's decision was proper, as "[i]t did not determine Mr. Halpin's entitlement to future benefits," leaving the defendant "free in the future to initiate further review of Mr. Halpin's continuing eligibility for long-term disability benefits." *Id.* This court does no different today.

5

("Grainger remains free in the future to initiate further review of Mr. Halpin's continuing eligibility for long-term disability benefits.").

Ms. Gillespie is therefore entitled to long-term disability benefits of $452.96 per month from August 2009 through December 2012, with prejudgment interest at 0.25% per month. By the court's calculation (see chart below), this comes out to $18,571.36 in benefits payments and $928.57 in prejudgment interest, for a total of $19,499.93.

| Month | Benefits Payment | Interest Rate | Months of Interest | Interest to Date |
|---|---|---|---|---|
| Dec 2012 | $452.96 | 0.25% | 0 | $0.00 |
| Nov 2012 | $452.96 | 0.25% | 1 | $1.13 |
| Oct 2012 | $452.96 | 0.25% | 2 | $2.26 |
| Sep 2012 | $452.96 | 0.25% | 3 | $3.40 |
| Aug 2012 | $452.96 | 0.25% | 4 | $4.53 |
| Jul 2012 | $452.96 | 0.25% | 5 | $5.66 |
| Jun 2012 | $452.96 | 0.25% | 6 | $6.79 |
| May 2012 | $452.96 | 0.25% | 7 | $7.93 |
| Apr 2012 | $452.96 | 0.25% | 8 | $9.06 |
| Mar 2012 | $452.96 | 0.25% | 9 | $10.19 |
| Feb 2012 | $452.96 | 0.25% | 10 | $11.32 |
| Jan 2012 | $452.96 | 0.25% | 11 | $12.46 |
| Dec 2011 | $452.96 | 0.25% | 12 | $13.59 |
| Nov 2011 | $452.96 | 0.25% | 13 | $14.72 |
| Oct 2011 | $452.96 | 0.25% | 14 | $15.85 |
| Sep 2011 | $452.96 | 0.25% | 15 | $16.99 |
| Aug 2011 | $452.96 | 0.25% | 16 | $18.12 |
| Jul 2011 | $452.96 | 0.25% | 17 | $19.25 |
| Jun 2011 | $452.96 | 0.25% | 18 | $20.38 |
| May 2011 | $452.96 | 0.25% | 19 | $21.52 |
| Apr 2011 | $452.96 | 0.25% | 20 | $22.65 |
| Mar 2011 | $452.96 | 0.25% | 21 | $23.78 |
| Feb 2011 | $452.96 | 0.25% | 22 | $24.91 |
| Jan 2011 | $452.96 | 0.25% | 23 | $26.05 |
| Dec 2010 | $452.96 | 0.25% | 24 | $27.18 |
| Nov 2010 | $452.96 | 0.25% | 25 | $28.31 |
| Oct 2010 | $452.96 | 0.25% | 26 | $29.44 |
| Sep 2010 | $452.96 | 0.25% | 27 | $30.57 |
| Aug 2010 | $452.96 | 0.25% | 28 | $31.71 |

| | | | | |
|---|---|---|---|---|
| Jul 2010 | $452.96 | 0.25% | 29 | $32.84 |
| Jun 2010 | $452.96 | 0.25% | 30 | $33.97 |
| May 2010 | $452.96 | 0.25% | 31 | $35.10 |
| Apr 2010 | $452.96 | 0.25% | 32 | $36.24 |
| Mar 2010 | $452.96 | 0.25% | 33 | $37.37 |
| Feb 2010 | $452.96 | 0.25% | 34 | $38.50 |
| Jan 2010 | $452.96 | 0.25% | 35 | $39.63 |
| Dec 2009 | $452.96 | 0.25% | 36 | $40.77 |
| Nov 2009 | $452.96 | 0.25% | 37 | $41.90 |
| Oct 2009 | $452.96 | 0.25% | 38 | $43.03 |
| Sep 2009 | $452.96 | 0.25% | 39 | $44.16 |
| Aug 2009 | $452.96 | 0.25% | 40 | $45.30 |
| **Total:** | **$18,571.36** | | | **$928.57** |

Date: December 19, 2012                    /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     Chief United States District Judge